UNITED STATES of America
v.
Grafton Earl STEWART.
Crim. A. No. 25825.

United States District Court
D. Maryland.
Jan. 18, 1963.

Joseph D. Tydings, U. S. Atty., Daniel F. McMullen, Jr., Asst. U. S. Atty., Baltimore, Md., for the United States.

Hayden C. Covington, Brooklyn, N. Y., and William O. Goldstein, Baltimore, Md., for defendant.

WINTER, District Judge.

Defendant was indicted for a violation of 50 U.S.C.A.App., § 462, for having knowingly failed and neglected, on or about August 9, 1961, to report for assignment, in lieu of induction, to civilian work contributing to the maintenance of the national health, safety or interest, and thereby having knowingly failed and neglected to perform a duty required of him by the Universal Military Training and Service Act, as amended, 50 U.S.C.A.App. §§ 451, et seq. Defendant requested a waiver of jury trial, which was consented to by the Government and approved by the Court. When the case came on for hearing, the Government offered defendant's selective service file, a stipulation that he had "knowingly failed and neglected to obey" the order of the Local Board, and a memorandum, hereafter discussed.

Thus, the proof adduced by the Government showed beyond reasonable doubt that, if the order of the Local Board was valid, defendant committed the acts charged in the indictment, but, as a defense, defendant contends that the order of Local Board No. 58, which defendant knowingly failed and neglected to obey, was unlawful, in that defendant, although classified as a conscientious objector (I–O), was improperly denied the ministerial exemption (IV–D). Thus, the case resolves itself to a question of whether defendant was properly classified by the Local Board.

In making this determination of fact and law, the Court must comply strictly with the established scope of judicial review in this area. Two principal authorities bear on this question:

Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946), comments upon the scope of judicial review of the validity of an order of a local board in a prosecution for failure to comply with the order. It was there said (pp. 122–123, 66 S.Ct. p. 427):

"The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act [Selective Training and Service Act of 1940, 50 U.S.C.A. (Appendix), § 311, et seq.] the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. *The decisions of local boards made in conformity with the regulations are final even though they may be erroneous.* The question of jurisdiction of the local board is reached only if there is *no basis in fact* for the classification which it gave the registrant. \* \* \*" (emphasis supplied)

Indeed, in this circuit, in Blalock v. United States, 247 F.2d 615 (4 Cir., 1957), it is said (p. 619):

"In a prosecution for refusing to submit to induction, the scope of judicial inquiry into the administrative proceedings leading to the defendant's classification is very limited. The range of review is the narrowest known to the law. \* \* \* The 'clearly erroneous' rule applied in equity appeals has no place here, nor even the 'substantial evidence' rule of the Administrative Procedure Act, 5 U.S.C.A. § 1009. Congress gave the courts no general authority of revision over draft board proceedings, and we have authority to reverse only if there is a denial of

basic procedural fairness or if the conclusion of the board is without *any basis in fact. \* \* \*"* (emphasis supplied)

To the same effect are Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953); Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955); Goff v. United States, 135 F.2d 610 (4 Cir., 1943) (relied on in Estep v. United States, supra); and Manke v. United States, 259 F.2d 518 (4 Cir., 1958).

■ It is also clear that the determination of whether there is a "basis in fact" for the board's order must be made on the record as it appeared before the local board, Dickinson v. United States, supra; and the burden of proof rests upon the defendant, Dickinson v. United States, supra; Bradshaw v. United States, 242 F.2d 180 (10 Cir., 1957); United States v. Kahl, 141 F.Supp. 161 (D.C.E.D.Mich.1956).

The statutes with which the Court is concerned are as follows: 50 U.S.C.A. App., § 454, provides that "Except as otherwise provided \* \* \* every male citizen \* \* \* who is between the ages of 18 years and 6 months and 26 years \* \* \* shall be liable for training and service in the Armed Forces of the United States \* \* \*." Among the "otherwise provided" as to training and service (but not as to registration) are "regular or duly ordained ministers of religion," 50 U.S.C.A.App., § 456(g), which in turn are defined in 50 U.S.C.A. App., § 466(g) as follows:

"(g) (1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and *who*

*as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship* as embodied in the creed or principles of such church, sect, or organization.

"(2) The term 'regular minister of religion' means one *who as his customary vocation* preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and *who is recognized by such church, sect, or organization as a regular minister.*

"(3) The term 'regular or duly ordained minister of religion' does not include a person *who irregularly or incidentally preaches and teaches* the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, but *who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship* as embodied in the creed or principles of his church, sect, or organization." (emphasis supplied)

These definitions were added by the Act of June 24, 1948, c. 625, Title I, § 16, 62 Stat. 624. Comment on them was made in Senate Report No. 1268, 80th Congress, Second Session, dated May 12, 1948, wherein it was said (p. 13):

"(g) Deferment of ministers and ministerial students.—Regular or duly ordained ministers of religion, and certain theological and pre-theological students, are exempted from induction but not registration. This sub-section parallels the 1940 Act, except as regards pre-theological students, who were not covered in the original statute. Serious

difficulties arose in the administration and enforcement of the 1940 Act because of the claims of members of one particular faith that all of its members were ministers of religion. A minority of the Supreme Court thought that Congress intended to grant an exemption broad enough to include this group. (see the dissenting opinions in Cox v. United States, 332 U.S. 442, 455, 457 [68 S.Ct. 115, 92 L.Ed. 59]). *In order that there may be no misunderstanding of the fact that the exemption granted is a narrow one, intended for the leaders of the various religious faiths and not for the members generally, the terms 'regular or duly ordained ministers of religion' have been defined in Section 16(g).* The definition is that which was contained in the 1917 Selective Service Regulation and which was successfully administered without the problems which arose under the 1940 act." (emphasis supplied)

■■ A reading of the statute, as amplified by a statement of the legislative intent, indicates that in order to be entitled to a ministerial exemption a registrant must show (a) that he is a minister within the statutory definition, and (b) that being a minister is his customary and regular vocation. It is clear that the mere fact that one is a member of a faith all of the members of which claim to be ministers neither constitutes a sufficient showing to entitle him to the ministerial exemption nor is it a sufficient basis for the denial of the exemption, Dickinson v. United States, supra; Rowell v. United States, 223 F.2d 863 (5 Cir., 1955); Pate v. United States, 243 F.2d 99 (5 Cir., 1957); United

States v. Rossi, 143 F.Supp. 878 (D.C. E.D.Mich.1956). Thus, the question is whether defendant met his burden of satisfying both of these two requirements so as to preclude there being a basis in fact for the denial of the exemption.

■ Only brief analysis of the record considered by the Local Board is necessary to show that there was a basis in fact for the Board to determine that defendant was not entitled to the ministerial exemption.[1] Defendant registered with the Selective Service System on June 3, 1955—two days after his eighteenth birthday—defendant having been born on June 1, 1937. When he completed a classification questionnaire, on or about December 1, 1956, he stated that he was an ordained minister of religion as a member of the Jehovah's Witnesses and that he had been ordained in 1952, when he was fifteen years old. He further stated that his then present occupation was as a carpenter, that he was paid $1.00 per hour for an average 40-hour week, but that he regarded this employment as occasional or part-time. A few days later the defendant filed an exception form for conscientious objectors. In it he stated that his training and belief was acquired from a study of the Bible, from his parents and from the Bible aids published by the Watchtower and Bible and Tract Society. He stated that he had given public expression of his views to the congregation in the Theocratic Ministry School which he attended every Friday evening at Easton, Maryland. He also stated that his job as a carpenter was temporary, that he would not work any longer than Christmas, 1956, and that he had taken the job to prepare him for the full-time ministry which he would begin on January 1, 1957. Defendant

---

1. Defendant contends that because the Local Board has inserted no evidence of its own, within the actual record, the Court is required, under Dickinson v. United States, supra, to find the Board's action unsubstantiated by any basis of fact. This, however, disregards what the Court said on this issue, "*The registrant's admissions, testimony of other witnesses, frequently unsolicited evidence from a registrant's neighbors, or information obtained from other agencies may produce dissidence which the boards are free to resolve,*" 346 U.S. at p. 397, 74 S.Ct. at p. 157. Cf. Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955).

also disclosed that the pastor or leader of his congregation was his father, and that defendant was the Magazine-Territory Servant and also the Bible-Study Servant.

Notwithstanding the earlier statement that defendant's secular employment was temporary, on March 21, 1960, defendant, in response to a Current Information Questionnaire, advised the Selective Service officials that he was a laborer and truckman for a laundry and dry cleaning concern, where he had been employed for two years and eleven months.[2] On May 3, 1960, this information was amplified, when defendant indicated that he worked in a laundry an eight-hour day at $1.00 per hour, and that his income during the preceding twelve months had been $2,200.00. On the same date, defendant stated that he then had the following titles in his group of Jehovah's Witnesses: Magazine Territory Servant, Bible-Study Servant, Ministry School Servant and Book Study Conductor. Defendant claimed that he had devoted not less than 170 hours per month to his claimed vocation as a minister, itemized as follows: Supervising work of Jehovah's Witnesses in revisiting and aiding people who are interested in Bible study—24 hours; presiding over Bible studies at certain designated meeting places throughout the Congregation's assigned territory—64 hours; supervising public distribution of Watchtower Society's periodicals—40 hours; and being in charge of the local school for instruction in the ministry—20 hours. In response to another question, defendant also stated that he spent 26 hours devoted to selling or distributing literature. How much of the time devoted to this activity overlaps the previously claimed 40 hours for public distribution of periodicals cannot be determined on this record, except that defendant appears to claim not less than 148 hours, and possibly as much as 174 hours. Assuming a standard 40-hour week, these totals should be compared to the approximately 174 average hours of secular employment in each month.[3]

Defendant also claimed that he was the only one in his Congregation qualified to perform the customary rites of religion. However, this allegation is somewhat contradicted by his previous admission that his father was the leader of the Congregation, and also the affidavits of the officials of The Watchtower Society which indicate that defendant's position was at the most an assistant presiding minister.

Defendant submitted to his Local Board various letters and statements of members of his faith, setting forth that the writers depended upon defendant for leadership in the capacity of Congregational Book Study Servant, Bible Study Servant, Magazine Territory Servant and Ministerial School Servant.[4] The Circuit Supervisor for Jehovah's Witnesses attested to defendant's zeal in carrying out his duties, and stated that they would be

---

2. A letter from defendant's employer requesting that defendant be classified as a conscientious objector states that "it would be difficult to replace him." Accordingly, the letter requests deferment so that the employer may retain him in his capacity at the laundry.

3. Although at first glance a month might seem to consist of only 160 hours' working time on the basis of a 40-hour week, there are in fact 174 hours' working time on this basis: 365 (days in a year) $\times$ $5/7 = 260\frac{5}{7}$ (working days a year) $\div$ 12 $= 21\frac{61}{84}$ (working days in a month) x 8 = 173.8.

4. Due to the fact that the letters contain bland allegations of defendant being a "leader" and "minister" and contain few, if any, facts to support these allegations, the weight to be accorded them is slight in view of the rule that fellow-members' characterization of one as a minister is not determinative of the right to the exemption, Dickinson v. United States, supra; Sunal v. Large, 157 F.2d 165 (4 Cir., 1946), aff'd. on other grounds 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947); Swaczyk v. United States, 156 F.2d 17 (1 Cir., 1946), cert. den. 329 U.S. 726, 67 S.Ct. 77, 91 L.Ed. 629. The latter two cases arose under the Selective Service and Training Act of 1940.

performed ordinarily by three different ministers, but were performed by defendant because of his ability. The Superintendent of Ministers and Evangelists of The Watchtower Bible and Tract Society certified that defendant officiates as an "assistant presiding minister" of the Easton Congregation of Jehovah's Witnesses, Central Unit, and that defendant was authorized to perform the baptismal ceremony, the burial ceremony and the marriage ceremony.

From these facts the Board may well have concluded either (a) that defendant's position with regard to his religious group was not one of leadership, or (b) that defendant's religious activities were not his customary and regular vocation.

As to the former, the mere statement of facts, and defendant's own description of his duties, as well as the description of other members of his Congregation, although they indicate that he may have occupied positions of leadership within limited spheres of his local congregation, fail to show he occupied a position of leadership in respect to the congregation as a whole, and, in fact, indicate that he occupied a subsidiary position as to the local congregation as a whole. In fact, his claims of sole leadership are refuted by his own admission that his father was the "pastor or leader" of his congregation, buttressed by the affidavits of the officials of The Watchtower Society that he was at best an "assistant presiding minister" within his congregation. What position an "assistant presiding minister" occupies within the institutional framework of The Watchtower Society is left open to speculation by defendant's proof. This proof by defendant failed to fulfill his burden of showing that he occupied a position of leadership; that his required civilian service of national importance would "leave a congregation without a cleric." Dickinson v. United States, supra, 346 U.S. at p. 395, 74 S. Ct. at p. 156; Schuman v. United States, 208 F.2d 801 (9 Cir., 1953). Cf. Martin v. United States, 4 Cir., 190 F.2d 775, cert. den. 342 U.S. 872, 72 S.Ct. 115, 96 L.Ed. 656. It follows that defendant's failure to present a prima facie case would constitute a sufficient basis in fact to sustain the Local Board's denial of the exemption.

As to the latter, defendant's first statement, that he regarded his secular employment as temporary, that he would soon devote himself full-time to his ministry, but that two years later he spent at least as much time, if not more, in secular activity as he claimed to spend in religious activity, could well serve as a basis for the conclusion that defendant's principal vocation was secular. United States v. Kutz, 199 F.Supp. 205 (D.C.E.D.Wisc.1961); United States v. Lebherz, 129 F.Supp. 444 (D.C.N.J.1955). See also: Swaczyk v. United States, supra. Generally as to the importance of time spent in pursuit of religious and secular activities, see Dickinson v. United States, supra, indicating that half time is not enough to entitle one to ministerial exemption; Cox v. United States, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947); Martin v. United States, supra; Leitner v. United States, 222 F.2d 363 (4 Cir., 1955); Sunal v. Large, supra. For these reasons, standing alone, the Court concludes that there was a basis in fact for the Board's order and, hence, that the Board's order is valid and defendant is guilty of the crime charged in the indictment.

At the trial, the Government offered, and there was admitted into evidence, a certified copy of a "Memorandum to National Selective Service Appeal Board Answering Questions re Jehovah's Witnesses," dated June 25, 1958, and prepared by Hayden C. Covington, Esq., General Counsel for Jehovah's Witnesses, and who also represented defendant here. In question and answer form, the memorandum makes a complete disclosure of the institutional structure of the Jehovah's Witnesses, and serves to place the ambit of defendant's ministerial functions within the organizational framework of that group.

When the memorandum was offered it was objected to by defendant's counsel, but admitted subject to a motion to

[redacted] 

strike, which motion was made. The principal ground for objection to the memorandum is that it was not a part of the record of proceedings with regard to defendant and, on the authority previously mentioned, the validity of the order of the Local Board is to be determined from the records before it.

As defendant contends, the validity of the order of the Local Board must be determined from the evidence before it. Although in a broad sense it might be argued that the filing of the memorandum with the National Selective Service Appeal Board constitutes the memorandum a part of the file of each registrant claiming the ministerial exemption, or even claiming a conscientious objector classification, as a member of Jehovah's Witnesses, there is nothing here to indicate that the Local Board was cognizant of the existence of the memorandum or in any way relied on it. The memorandum was received as evidence, without objection, in United States v. Tettenburn, 186 F.Supp. 203 (D.C.Md. 1960), and its pertinent portions in regard to the organizational structure of Jehovah's Witnesses discussed fully in the opinion filed in that case.

In the light of the finding of the validity of the order of the Local Board, and the finding of the defendant's guilt, *without reference to the memorandum,* it is unnecessary to decide whether this challenged evidence should be stricken.

Of the authorities relied upon by the defendant to establish his innocence, principal reliance is placed upon Wiggins v. United States, 261 F.2d 113 (5 Cir., 1958), where a defendant, who was a book study conductor, was held entitled to the ministerial exemption because it was thought that his duties in regard to instruction in the Bible, conducting Bible study classes, preaching on street corners, and house-to-house calls, and training others in the work was roughly analogous to that of an assistant minister or assistant pastor. The incorrectness of the Wiggins decision is amply demonstrated in United States v. Tettenburn, supra, and need not be repeated at length. It suffices to say that I concur fully in Judge Watkins' analysis and criticism of the Wiggins decision.

Based upon the record as presented before the Local Board, standing alone, I find the defendant guilty of the crime for which he is indicted.